| | |
|---|---|
| Robert J. Gringas<br>GINGRAS, CATES AND WACHS<br>8150 Excelsior Drive<br>Madison, WI 53717<br>Tel: (608) 833-2632<br>gingras@gcwlawyers.com | Meiram Bendat (subject to *pro hac* vice admission)<br>PSYCH-APPEAL, INC.<br>8560 West Sunset Boulevard, Suite 500<br>West Hollywood, CA 90069<br>Tel: (310) 598-3690, x.101<br>mbendat@psych-appeal.com |
| D. Brian Hufford (subject to<br>   *pro hac vice* admission)<br>Jason S. Cowart (subject to<br>   *pro hac vice* admission)<br>ZUCKERMAN SPAEDER LLP<br>1185 Avenue of the Americas, 31st Floor<br>New York, NY 10036<br>Tel: (212) 704-9600<br>dbhufford@zuckerman.com<br>jcowart@zuckerman.com | Caroline E. Reynolds (subject to<br>   *pro hac vice* admission)<br>ZUCKERMAN SPAEDER LLP<br>1800 M St., NW, Suite 1000<br>Washington, DC 20036<br>Tel: (202) 778-1800<br>creynolds@zuckerman.com |
| Adam B. Abelson (subject to<br>   *pro hac vice* admission)<br>ZUCKERMAN SPAEDER LLP<br>100 East Pratt St., Suite 2440<br>Baltimore, MD 21202<br>Tel: (410) 332-0444<br>aabelson@zuckerman.com | |

*Attorneys for Plaintiffs*

# UNITED STATED DISTRICT COURT
# WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| LUCIANA BERCEANU, on her own behalf and on behalf of her beneficiary daughter, and all others similarly situated, JUDY HERNANDEZ, on her own behalf and on behalf of her beneficiary husband, and all others similarly situated,<br><br>               Plaintiffs,<br><br>   v.<br><br>UMR, INC.,<br><br>               Defendant. | Case No. 19 cv 568<br><br><br>**CLASS ACTION COMPLAINT** |

# THE PARTIES

1. Plaintiff Luciana Berceanu is a participant in the Advanced Pain Management LLC Group Benefit Plan (the "Berceanu Plan"), which is sponsored by Ms. Berceanu's employer, Advanced Pain Management LLC. Plaintiff Berceanu's daughter, a beneficiary of the Berceanu Plan, appointed Plaintiff Berceanu as her agent with respect to the claims asserted herein pursuant to a Power of Attorney. Plaintiff Berceanu and her daughter are residents of Wisconsin.

2. Plaintiff Judy Hernandez is a participant in the Kawasaki Welfare Benefits Plan (the "Hernandez Plan"), which is sponsored by Ms. Hernandez's employer, Kawasaki Precision Machinery (USA), Inc.  Plaintiff Hernandez's husband, a beneficiary of the Hernandez Plan, appointed Plaintiff Hernandez as his agent with respect to the claims asserted herein pursuant to a Power of Attorney. Plaintiff Hernandez and her husband are residents of Michigan.

3. Defendant UMR is a corporation organized under Wisconsin law with its principal place of business located in Wausau, Wisconsin. UMR is responsible for adopting and applying the defective UBH guidelines referenced herein and adjudicating the claims for benefits referenced herein. It is also responsible for causing the ERISA plans referenced herein to issue benefits for covered services.

# JURISDICTION AND VENUE

4. Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331.

5. Personal jurisdiction exists over UMR, and this District is the proper venue, because UMR conducts significant operations in this District, regularly communicates with insureds who reside in this District, and is headquartered in this District. Plaintiff Berceanu also resides in this District.

# FACTUAL BACKGROUND

**A. The Plaintiffs' Plans**

6. The Berceanu Plan and the Hernandez Plan (collectively, the "Plaintiffs' Plans") are both governed by ERISA.

7. The Plaintiffs' Plans both cover treatment for sickness, injury, mental illness, and

substance use disorders. Residential treatment is a covered benefit under the Plaintiffs' Plans.

8. UMR is the benefit claims administrator for the Plaintiffs' Plans. As such, both Plans grant discretion to UMR to interpret plan terms, including limitations and exclusions, in determining whether services are covered and to cause any resulting benefit payments to be made by the Plans.

9. Because UMR exercises discretion with respect to the administration of the Plaintiffs' Plans, and makes all benefit determinations, UMR is a fiduciary within the meaning of ERISA, 29 U.S.C. § 1104.

10. Under the terms of the Plaintiffs' Plans, an essential condition of coverage is that covered services must be consistent with generally accepted standards of medical practice. Moreover, in making benefit determinations on behalf of all of its Plans, UMR applies a uniform definition of medical necessity which explicitly incorporates generally accepted standards of medical practice as the basis for coverage.

11. Therefore, one of the essential determinations UMR must make when reviewing claims for coverage under the Plaintiffs' Plans is whether services are consistent with generally accepted standards of medical practice.

**B. Generally Accepted Standards of Medical Practice**

12. Generally accepted standards of medical practice, in the context of mental health and substance use disorder services, are the standards that have achieved widespread acceptance among behavioral health professionals.

13. In the area of mental health and substance use disorder treatment, there is a continuum of intensity at which services are delivered. There are generally accepted standards of medical practice for matching patients with the level of care that is most appropriate and effective for treating patients' conditions. These generally accepted standards of medical practice can be gleaned from multiple sources, including peer-reviewed studies in academic journals, consensus guidelines from professional organizations, and guidelines and materials distributed by government agencies, including: (a) the American Society of Addiction Medicine ("ASAM") Criteria; (b) the American Association of Community Psychiatrist's ("AACP")

Level of Care Utilization System; (c) the Child and Adolescent Level of Care Utilization System ("CALOCUS") developed by AACP and the American Academy of Child and Adolescent Psychiatry ("AACAP"), and the Child and Adolescent Service Intensity Instrument, which was developed by AACAP in 2001 as a refinement of CALOCUS; (d) the Medicare benefit policy manual issued by the Centers for Medicare and Medicaid Services; (e) the APA Practice Guidelines for the Treatment of Patients with Substance Use Disorders, Second Edition; (f) the American Psychiatric Association's Practice Guidelines for the Treatment of Patients with Major Depressive Disorder; and (g) AACAP's Principles of Care for Treatment of Children and Adolescents with Mental Illnesses in Residential Treatment Centers.

14.     The generally accepted standards of medical practice for matching patients with the level of care that is most appropriate and effective for treating patients' mental health conditions and substance use disorders include the following:

(a)     **First**, many mental health and substance use disorders are long-term and chronic. While current symptoms are typically related to a patient's chronic condition, it is generally accepted in the behavioral health community that effective treatment of individuals with mental health or substance use disorders is not limited to the alleviation of the current symptoms. Rather, effective treatment requires treatment of the chronic underlying condition as well.

(b)     **Second**, many individuals with behavioral health diagnoses have multiple, co-occurring disorders. Because co-occurring disorders can aggravate each other, treating any of them effectively requires a comprehensive, coordinated approach to all conditions. Similarly, the presence of a co-occurring medical condition is an aggravating factor that may necessitate a more intensive level of care for the patient to be effectively treated.

(c)     **Third**, in order to treat patients with mental health or substance use disorders effectively, it is important to "match" them to the appropriate level of care. The driving factors in determining the appropriate treatment level should be safety and effectiveness; however, where more than one service level will equally meet both of these requirements, the least intensive and/or restrictive setting should be selected.

(d)     **Fourth**, when there is ambiguity as to the appropriate level of care, generally accepted standards call for erring on the side of caution by placing the patient in a higher level of care. Research has demonstrated that patients with mental health and substance use disorders who receive treatment at a lower level of care than is clinically appropriate face worse outcomes than those who are treated at the appropriate level of care. On the other hand, there is no research that establishes that placement at a higher level of care than is appropriate results in an increase in adverse outcomes.

(e)     **Fifth**, while effective treatment may result in improvement in the patient's level of functioning, it is well-established that effective treatment also includes treatment aimed at preventing relapse or deterioration of the patient's condition and maintaining the patient's level of functioning.

(f)     **Sixth**, the appropriate duration of treatment for behavioral health disorders is based on the individual needs of the patient; there is no specific limit on the duration of such treatment. Similarly, it is inconsistent with generally accepted standards of medical practice to require discharge as soon as a patient becomes unwilling or unable to participate in treatment.

(g)     **Seventh**, one of the primary differences between adults, on the one hand, and children and adolescents, on the other, is that children and adolescents are not fully "developed," in the psychiatric sense. The unique needs of children and adolescents must be taken into account when making level of care decisions involving their treatment for mental health or substance use disorders. One of the ways practitioners take into account the developmental level of a child or adolescent in making treatment decisions is by relaxing the threshold requirements for admission and continued service at a given level of care.

(h)     **Eighth**, the determination of the appropriate level of care for patients with mental health and/or substance use disorders should be made on the basis of a multidimensional assessment that takes into account a wide variety of information about the patient. Except in acute situations that require hospitalization, where safety alone may

necessitate the highest level of care, decisions about the level of care at which a patient should receive treatment should be made based upon a holistic, biopsychosocial assessment that involves consideration of multiple dimensions.

15. As a claims administrator and ERISA fiduciary, UMR assumed the burden of taking reasonable steps to interpret its plans, including with respect to making decisions about whether services for which coverage is requested are consistent with generally accepted standards.

16. In doing so, UMR had access to the independent, publicly available sources, described above, that describe the generally accepted standards of medical practice. As such, UMR knew, or should have known, what the generally accepted standards of medical practice actually are.

**C. UMR's Adoption of UBH's Clinical Policies**

17. UMR exercised its discretion under the Plaintiffs' Plans to determine what generally accepted standards of medical practice are in the behavioral health context. It did so by adopting and applying clinical criteria developed by its corporate affiliate, United Behavioral Health ("UBH," d/b/a "Optum"). Both UMR and UBH are wholly-owned subsidiaries of United Health Group ("UHG"). UHG controls all of its subsidiaries, including UMR and UBH, and they all operate effectively as a single unit to apply uniform and standardized policies when administering health insurance plans, including the Plaintiffs' Plans.

18. The clinical criteria UMR adopted are referred to as the UBH Level of Care Guidelines ("LOCGs").

19. The LOCGs are organized by the situs of care (or "level of care") according to progressive levels of service intensity along the continuum of care (i.e., outpatient, intensive outpatient, partial hospitalization, residential, and hospital).

20. Each version of the LOCGs at issue in this case contained a set of mandatory "Common Criteria," all of which had to be satisfied for coverage to be approved at any level of care. In addition, the LOCGs contained specific criteria applicable to particular levels of care in the context of either mental health conditions or substance use disorders, which also had to be

satisfied in order for coverage to be approved at a particular level of care.

21. UBH regularly reevaluates its Guidelines and has reissued them at least annually during the period relevant to this case.

22. UMR has adopted and applied, wholesale, whatever version of UBH's LOCGs are then in effect. UMR does not perform any independent analysis to confirm that UBH's LOCGs are consistent with generally accepted standards of medical practice.

23. In fact, the UBH LOCGs in effect at all times relevant to this lawsuit were pervasively more restrictive than generally accepted standards of medical practice, because they failed to comply with every one of the generally accepted standards set forth above.

**D. UBH's Guidelines, Including Those At Issue Here, Are Much More Restrictive Than Generally Accepted Standards**

24. On March 5, 2019, Chief Magistrate Judge Joseph C. Spero of the United States District Court for the Northern District of California issued post-trial Findings of Fact and Conclusions of Law in the consolidated class action cases, *Wit et al. v. United Behavioral Health*, Case No. 14-cv-02346 (N.D. Cal.) and *Alexander et al. v. United Behavioral Health*, Case No. 14-cv-05337 (N.D. Cal.) (collectively, "*Wit/Alexander*"). In a detailed opinion, Judge Spero held that the UBH LOCGs in effect from 2011-2017 were pervasively much more restrictive than generally accepted standards of medical practice because they myopically restrict coverage to the treatment of acute behavioral health conditions and symptoms, in contrast to generally accepted standards that also call for effective treatment to address chronic or co-occurring conditions or symptoms. As Judge Spero held, UBH's LOCGs were "riddled with requirements that provided for narrower coverage than is consistent with generally accepted standards of care." Judge Spero further found that these defects were driven by UBH's financial self-interest, and that use of the LOCGs to determine whether services were consistent with generally accepted standards was "unreasonable and an abuse of discretion because they were more restrictive than generally accepted standards of care."

25. Among other Guidelines, Judge Spero's decision in *Wit/Alexander* applied to the 2016 UBH LOCGs that UMR used to deny coverage to Plaintiff Berceanu's daughter.

26. In late 2018, UBH announced that, as of February 1, 2019, it would "retire" its proprietary substance use guidelines and instead begin applying level-of-care criteria for substance use disorder treatment developed by a non-profit, clinical specialty association, the American Society of Addiction Medicine ("ASAM").

27. On June 14, 2019, UBH informed Judge Spero that it also intends to discontinue use of its LOCGs for mental health treatment and to transition to non-profit, clinical specialty association guidelines by early 2020.

28. Notwithstanding these developments, and even though UMR knew (or should have known) that UBH's LOCGs and were much more restrictive than generally accepted standards of medical practice and that UBH developed them to advance its own financial self-interest as well as that of its other corporate affiliates and employer-plan sponsors, UMR has adopted and continues to apply UBH's unreasonably overly-restrictive Level of Care Guidelines. It does so because they are free of charge to UMR (UMR would incur licensing and other costs if it used third-party guidelines developed by a non-UHG subsidiary), because using other guidelines would cause problems for UMR's corporate affiliates because it would draw attention to the fact that UBH's guidelines are different even though the relevant plan term is the same (i.e., generally accepted standards of medical practice), because UMR's use of UBH's guidelines allows it to save plan-sponsor employers money (albeit in contravention of plan terms) and therefore makes it more likely that they will employ UMR as a claims administrator, and because it allows UMR's corporate affiliates to save money vis-à-vis the stop-loss policies they sell to UMR's plan-sponsor employer customers and which UMR markets.

29. Rather than applying available and broadly accepted independent guidelines, UMR instead adopted the guidelines created by its own conflicted corporate affiliate, UBH. Had UMR honored its fiduciary duties in determining which guidelines it would rely upon in making medical necessity determinations with respect to behavioral health services, UMR would not have done so because it would have known from the easily accessible sources of generally accepted standards referenced above that UBH's guidelines were much more restrictive than generally accepted standards of care because. UMR would have also known that UBH allowed

the guideline development process to be infected by UBH's own financial considerations, as Judge Spero found.

30. Like the LOCGs at issue in *Wit/Alexander* (which include the 2016 LOCG UMR used to deny coverage to Plaintiff Berceanu's daughter), subsequent editions of the LOCGs (including those that were used to deny coverage to Plaintiff Hernandez's husband) continue to deviate from generally accepted standards.

31. For example, while the 2018 and 2019 LOCGs purport to "include[] consideration of the acute and chronic symptoms in the member's history," the actual criteria in those LOCGs fail to take account of such chronic conditions or symptoms as factors upon which coverage can be granted.

32. Additionally, the 2018 and 2019 LOCGs deviate from generally accepted standards of medical practice by, for example, instructing that determination of the appropriate level of care for the purposes of making coverage decisions should be based only on whether treatment of the *current* condition is likely to be effective at that level of care, whereas treatment of co-occurring conditions need only be sufficient to "safely manage[]" them.

33. The 2018 and 2019 LOCGs also omit any evaluation of whether a member's co-occurring conditions can be effectively treated in the requested level of care, or whether those conditions complicate or aggravate the member's situation such that an effective treatment plan requires a more intensive level of care than might otherwise be appropriate.

34. Furthermore, the 2018 and 2019 LOCGs deviate from generally accepted standards of medical practice by failing to instruct against moving patients to less restrictive levels of care at which they can be safely treated when such lower levels of care may be less effective.

35. Like the 2017 LOCGs, the 2018 and 2019 LOCGs deviate from generally accepted standards of medical practice by failing to address in any meaningful way the different standards that apply to children and adolescents with respect to the treatment of mental health and substance use disorders. For example, the LOCGs omit any separate level-of-care criteria tailored to the unique needs of children and adolescents. They also fail to instruct decision-

makers to apply the criteria contained in the LOCGs differently when the member is a child or adolescent, such as by relaxing the criteria for admission and continued stay to take into account their stage of development and the slower pace at which children and adolescents generally respond to treatment.

36.  Like the 2017 LOCGs, the 2018 and 2019 LOCGs deviate from generally accepted standards of medical practice by, among other things, providing that the "continued stay criteria are no longer met" when, merely "after an *initial* assessment," the "member is unwilling or unable to participate in treatment, and involuntary treatment or guardianship is not being pursued."

37.  With respect to residential treatment, the 2018 and 2019 LOCGs also fail to provide for stabilization and maintenance of function, and improperly broaden the concept of "custodial care" beyond the generally accepted definition of that term by, among other things, designating services as "custodial" even when they include "skilled services."

38.   Like the 2017 LOCGs, the 2018 and 2019 LOCGs deviate from generally accepted standards of medical practice by containing a collection of mandatory criteria that must each be independently assessed and satisfied instead of a collection of criteria that are holistically analyzed. This flaw compounds the effect of the other deviations from generally accepted standards of medical practice set forth herein.

### E. UMR Denied Plaintiffs' Beneficiaries' Claims for Coverage Pursuant to UBH's Guidelines.

#### Plaintiff Berceanu

39.  On June 9, 2016, Plaintiff's daughter, then a minor, was admitted for residential treatment at Rogers Memorial Hospital in Wisconsin.

40.  UMR approved coverage for Plaintiff Berceanu's daughter's residential treatment through June 26, 2016.

41.  By letter dated June 29, 2016, however, UMR denied coverage for any residential treatment from June 27, 2016 forward, citing the 2016 UBH LOCGs for mental health residential treatment. Based on the UBH guidelines, UMR determined that the treatment for

which coverage was sought was inconsistent with generally accepted standards of medical practice.

42. Plaintiff Berceanu's plan requires one mandatory internal appeal, which was exhausted. By letter dated July 11, 2016, UMR upheld its adverse determination.

43. In applying the UBH guidelines, UMR's reviewers' explanations for the adverse benefit determinations included that "There is no indication the patient is in any way dangerous, violent, threatening, or aggressive," and that "there is no indication the patient has improved to any significant extent at the residential level of care" despite the scant treatment UMR authorized. Those considerations are consistent with the UBH guidelines, but fundamentally deviate from generally accepted standards of medical practice for the reasons identified above.

44. Applying the 2016 UBH LOCGs, UMR concluded that Plaintiff Berceanu's daughter could be treated less expensively in an outpatient partial hospital program.

45. Residential treatment includes all the clinical components of a partial hospitalization program. Thus, services at a partial hospitalization level of care are necessarily included within residential treatment services.

46. Upon the clinical advice of her actual treating providers, Plaintiff Berceanu's daughter remained in residential treatment at Rogers until August 30, 2016, during which she received those included partial hospitalization services.

47. Despite finding that Plaintiff Berceanu's daughter met the criteria for coverage for services at the partial hospitalization level of intensity, UMR denied all coverage for her continued care in her residential treatment program, rather than reimbursing at the rate applicable to partial hospitalization.

48. UMR's failure to approve Plaintiff Berceanu's daughter's claims at the rate for the level of care for which UMR found she qualified (partial hospitalization) created a windfall for the Berceanu Plan's sponsor and for UMR's affiliated stop-loss insurer.

49. Plaintiff Berceanu incurred significant unreimbursed expenses for her daughter's residential treatment.

**Plaintiff Hernandez**

50. On or about February 19, 2019, Plaintiff Hernandez's husband was admitted for residential treatment of substance use disorder, complicated by a co-occurring mental health condition, at Shadow Mountain Recovery Center ("Shadow Mountain") in New Mexico.

51. UMR approved coverage for Mr. Hernandez's residential treatment through March 6, 2019.

52. By letter dated March 8, 2019, however, UMR denied coverage for any residential treatment from March 7, 2019 forward, citing the 2019 UBH Level of Care Guidelines for substance abuse residential rehabilitation. Based on the UBH guideline, UMR determined that the treatment for which coverage was sought was inconsistent with generally accepted standards of medical practice.

53. Plaintiff Hernandez's plan requires one mandatory internal appeal, which was exhausted. By letter dated April 2, 2019, UMR upheld its adverse determination.

54. Applying the 2019 UBH LOCGs, UMR concluded that Mr. Hernandez could be treated less expensively in an intensive outpatient program.

55. Residential treatment includes all the clinical components of an intensive outpatient program. Thus, services at an intensive outpatient level of care are necessarily included within residential treatment services.

56. Upon the clinical advice of the actual treating providers, Mr. Hernandez remained in residential treatment at Shadow Mountain until March 26, 2019, during which he received those included intensive outpatient services.

57. Despite finding that Mr. Hernandez met the criteria for coverage for services at the intensive outpatient level of intensity, UMR denied all coverage for his continued care in his residential treatment program, rather than reimbursing at the rate applicable to intensive outpatient programs.

58. UMR's failure to approve Mr. Hernandez's claims at the rate for the level of care for which UMR found he qualified (intensive outpatient treatment) created a windfall for the Hernandez Plan's sponsor and for UMR's affiliated stop-loss insurer.

59. Plaintiff Hernandez incurred significant unreimbursed expenses for her husband's residential treatment.

### F. UMR Violated ERISA and Plan Terms

60. In light of its central role in administering claims for coverage of mental health and substance abuse disorder treatment, UMR is an ERISA fiduciary as defined by 29 U.S.C. § 1104(a). By adopting and applying the coverage and level of care guidelines of its affiliate, UBH, which are overly restrictive and in contravention of generally accepted standards of care, UMR violated those fiduciary duties. Moreover, by using those guidelines to deny Plaintiff's claims, UMR violated the written terms of Plaintiffs' plans.

## CLASS ACTION ALLEGATIONS

61. Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

62. UMR serves as the claims administrator for other health insurance plans that, like the Berceanu and Hernandez Plans, require, as an essential condition of coverage, that services must be consistent with generally accepted standards of medical practice. The policies and practices that UMR followed in administering the claims filed by Plaintiffs Berceanu and Hernandez are the same as those that have been applied by UMR to other similarly-situated insureds seeking mental health and substance use disorder treatment benefits under their ERISA health plans.

63. As such, pursuant Federal Rule of Civil Procedure 23, Plaintiffs bring their claims on behalf of a putative class of similarly situated individuals as noted in the counts below. The class (the "Class") is defined as follows:

> Any member of a health benefit plan governed by ERISA whose request for coverage of residential treatment services for a mental illness or substance use disorder was denied by UMR, in whole or in part, within the applicable statute of limitations, based on UBH's Level of Care Guidelines or UBH's Coverage Determination Guidelines.

64. The members of the Class can be objectively ascertained through the use of

information contained in UMR's files because UMR knows who its insureds are, which plans they are insured by, what type of claims they have filed, and how those claims were adjudicated.

65. Upon information and belief, there are so many persons within the putative class that joinder is impracticable.

66. Certification of the Class is desirable and proper because there are questions of law and fact in this case that are common to all members of each of the class. Such common questions of law and fact include, but are not limited to, the common questions identified in Judge Spero's September 19, 2016 Order Granting Motion for Class Certification in *Wit*, Case No. 14-cv-02346 JCS, ECF No. 133 and *Alexander*, Case No. 14-cv-05337 JCS, ECF No. 97. Certification is desirable and proper because the Plaintiffs' claims are typical of the claims of the members of the class Plaintiffs seek to represent.

67. Certification is also desirable and proper because the Plaintiffs will fairly and adequately protect the interests of the class they seek to represent. There are no conflicts between the interests of the Plaintiffs and those of other members of the class, and the Plaintiffs are cognizant of their duties and responsibilities to the entire class. Plaintiffs' attorneys are qualified, experienced and able to conduct the proposed class action litigation.

68. It is desirable to concentrate the litigation of these claims in this forum. The determination of the claims of all class members in a single forum, and in a single proceeding would be a fair and efficient means of resolving the issues in this litigation.

69. The difficulties likely to be encountered in the management of a class action in this litigation are reasonably manageable, especially when weighed against the virtual impossibility of affording adequate relief to the members of the class through numerous separate actions.

## COUNT I

### CLAIM FOR BREACH OF FIDUCIARY DUTY
### BROUGHT ON BEHALF OF PLAINTIFFS AND THE CLASS

70. Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

71.     This count is brought pursuant to 29 U.S.C. § 1132(a)(1)(B).

72.     As the entity responsible for making mental health and substance abuse benefit determinations under the Plaintiffs' Plans, and as an entity that has exercised discretion with respect to the administration of those plans, UMR is an ERISA fiduciary subject to the fiduciary duties identified in 29 U.S.C. § 1104(a).

73.     UMR violated these duties by adopting the restrictive guidelines discussed herein. Despite the fact that the health insurance plans that insure Plaintiffs and the Class provide for a determination of whether services for which coverage is requested are consistent with generally accepted standards of medical practice, the fact that the generally accepted standards of medical practice are widely available and well-known to UMR, and the fact that UMR asserted that the UBH guidelines were consistent with standards that are generally accepted, the guidelines UMR adopted are in fact far more restrictive than the generally accepted standards. In adopting the Guidelines and using them to deny coverage to Plaintiffs' beneficiaries, UMR did not act "solely in the interests of the participants and beneficiaries" for the "exclusive purpose" of "providing benefits." It did not utilize the "care, skill, prudence, and diligence" of a "prudent man" acting in a similar capacity. It did not act in accordance with the terms of Plaintiffs' Plans.

74.     Instead, UMR elevated its own interests and those of its corporate affiliates and plan-sponsor employer customers above the interests of plan participants and beneficiaries. By adopting improperly restrictive guidelines, UMR dramatically narrowed the scope of coverage available under the Plaintiffs' Plans and artificially decreased the number and value of covered claims, thereby benefiting these other parties and itself.

75.     Plaintiffs and the members of the Class have been harmed by UMR's breaches of fiduciary duty because UMR's adoption of the excessively restrictive standards narrowed the scope of coverage available under their plans and because their claims for benefits were determined according to a standard that conflicted with the terms of their plans. UMR's use of these excessively restrictive guidelines made it less likely that UMR would determine that their claims were covered.

# COUNT II

## CLAIM FOR IMPROPER DENIAL OF BENEFITS
## BROUGHT ON BEHALF OF PLAINTIFFS AND THE CLASS

76. Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

77. This count is brought pursuant to 29 U.S.C. §1132(a)(1)(B).

78. UMR denied the insurance claims for residential treatment submitted by Plaintiffs and other members the Class in violation of the terms of the Plaintiffs' Plans and the plans that insure members of the Class. UMR denied these claims, at least in part, based on its systematic practice of applying guidelines that are more restrictive than generally accepted standards of medical practice, as set forth above.

79. Additionally, UMR wrongfully failed to pay benefits for services that it deemed covered by Plaintiffs' Plans (e.g., partial hospitalization and intensive outpatient treatment) for no reason other than the fact that those services were obtained as part of treatment at a higher level of care (e.g., residential treatment).

# COUNT III

## CLAIM FOR EQUITABLE RELIEF
## BROUGHT ON BEHALF OF PLAINTIFFS AND THE CLASS

80. Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

81. This count is brought pursuant to 29 U.S.C. § 1132(a)(3)(A) only to the extent that the Court finds that the injunctive relief sought to remedy Counts I and/or II are unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B).

82. Plaintiffs and the Class have been harmed, and are likely to be harmed in the future, by UMR's breaches of fiduciary duty described above.

83. In order to remedy these harms, Plaintiffs and the Class are entitled to enjoin these acts and practices pursuant to 29 U.S.C. § 1132(a)(3)(A).

## COUNT IV

### CLAIM FOR OTHER APPROPRIATE EQUITABLE RELIEF
### BROUGHT ON BEHALF OF PLAINTIFFS AND THE CLASS

84. Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

85. This count is brought pursuant to 29 U.S.C. § 1132(a)(3)(B) only to the extent the Court finds that the equitable relief sought to remedy Counts I and II are unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B).

86. Plaintiffs and the Class have been harmed, and are likely to be harmed in the future, by UMR's breaches of fiduciary duty described above.

87. Additionally, by engaging in this misconduct, UMR allowed its corporate affiliates to be unjustly enriched insofar as they were not required to pay benefit claims.

88. In order to remedy these harms, Plaintiffs and the Class are entitled to appropriate equitable relief pursuant to 29 U.S.C. § 1132(a)(3)(B).

### REQUESTED RELIEF

WHEREFORE, Plaintiffs demand judgment in their favor against Defendant as follows:

A. Certifying the Class and their claims, as set forth in this Complaint, for class treatment;

B. Appointing the Plaintiffs as Class Representatives for the Class;

C. Designating Plaintiffs' counsel as Class Counsel;

D. Declaring that UMR's adoption of the guidelines complained of herein violated UMR's fiduciary duties;

E. Issuing a permanent injunction ordering UMR to stop utilizing the guidelines complained of herein, and instead adopt guidelines that are consistent with generally accepted standards of medical practice;

F. Ordering UMR to reprocess claims for residential treatment that it previously denied (in whole or in part) pursuant to new guidelines that are consistent with generally accepted standards of medical practice;

G. Other appropriate equitable relief, including declaratory and injunctive relief;

H. Awarding Plaintiffs' disbursements and expenses for this action, including reasonable counsel and expert fees, in amounts to be determined by the Court, pursuant to 29 U.S.C. § 1132(g); and

I. Granting such other and further relief as is just and proper, including but not limited to removal of UMR as a fiduciary as a result of its pattern of conduct in violation of its fiduciary duties under ERISA.

Dated: July 11, 2019

Respectfully submitted,

*s/ Paul A. Kinne*
GINGRAS, CATES AND WACHS
Robert J. Gringas
State Bar No. 1002909
Paul A. Kinne
State Bar No. 1021493
8150 Excelsior Drive
Madison, WI 53717
Tel: (608) 833-2632
gingras@gcwlawyers.com

PSYCH-APPEAL, INC.
Meiram Bendat (subject to *pro hac vice* admission)
8560 West Sunset Boulevard, Suite 500
West Hollywood, CA 90069
Tel: (310) 598-3690, x.101
mbendat@psych-appeal.com

ZUCKERMAN SPAEDER LLP
Caroline E. Reynolds (subject to *pro hac vice* admission)
1800 M St., NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
creynolds@zuckerman.com

ZUCKERMAN SPAEDER LLP
D. Brian Hufford (subject to *pro hac vice* admission)
Jason S. Cowart (subject to *pro hac vice* admission)
1185 Avenue of the Americas, 31st Floor
New York, NY 10036

Tel: (212) 704-9600
dbhufford@zuckerman.com
jcowart@zuckerman.com

ZUCKERMAN SPAEDER LLP
Adam B. Abelson (subject to *pro hac vice* admission)
100 East Pratt St., Suite 2440
Baltimore, MD 21202
Tel: (410) 332-0444
aabelson@zuckerman.com

*Attorneys for Plaintiffs*