IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

LUCIANA BERCEANU and JUDY
HERNANDEZ, on behalf of themselves,
their respective beneficiaries and all
others similarly situated,

                          Plaintiffs,                        OPINION AND ORDER

    v.
                                                              19-cv-568-wmc
UMR, INC.,

                          Defendant.

Plaintiffs Luciana Berceanu and Judy Hernandez filed this ERISA class action against defendant UMR, Inc., a benefit claims administrator for hundreds of employer-sponsored health care plans nationwide.  Plaintiffs claim that UMR violated ERISA by adopting and applying overly strict guidelines to deny their requests for residential treatment for mental health and substance abuse disorders, contrary to the terms of the benefit plans and UMR's fiduciary duties.  In a previous order, this court certified a class of current and former members of health benefit plans whose requests for coverage of residential treatment services were denied by UMR between July 11, 2016 and January 31, 2020, based in whole or in part on the same guidelines.  (Dkt. #104.)

Still pending before the court is UMR's motion for summary judgment (dkt. #127), which will be granted.  As discussed below, plaintiffs have failed to establish constitutional standing on behalf of most of the class members, and however inadvertently, demonstrated that the issue of standing cannot be resolved on a class-wide basis.  Thus, the class must be decertified.  With respect to the named plaintiffs' remaining claims, the evidence shows

that UMR's adoption of the challenged guidelines comports with the plans' terms, and as to its application to plaintiffs' denial of coverage, was a proper exercise of discretion as a fiduciary in keeping with ERISA.

## UNDISPUTED FACTS[1]

### A.  The Parties

Plaintiffs are current or former participants in employer-sponsored health benefit plans whose requests for coverage of residential treatment services for mental illnesses or substance use disorders were denied by defendant UMR, Inc., as the benefit claims administrator for their respective health benefit plans.  As the benefit claims administrator for these plans, UMR's role was limited to deciding benefits coverage requests and appeals, and each plan granted UMR discretion to interpret and apply that plan's terms, limitations and exclusions in making benefits determinations.

### B.  The Health Benefit Plans[2]

While plaintiffs and the other class members are or were enrolled in hundreds of different employer-sponsored health benefit plans administered by UMR, all plans have some commonalities.  For example, all plan documents lay out in detail both the scope of

---

[1] The following facts are drawn from the parties' proposed findings of fact and responses, as well as the underlying evidence submitted by the parties, and are deemed undisputed for purposes of summary judgment, unless otherwise noted.  On the same basis, additional, undisputed facts are discussed as they become relevant to the court's opinion below.

[2] For purposes of summary judgment, the parties also agreed that class member-specific evidence, including evidence of the applicable plan terms, is limited to the records produced for the two named plaintiffs *and* 50 other class members randomly selected by the parties.

coverage provided by the plan and exclusions or limitations that narrow that scope; and each plan includes a section titled "covered services," "covered benefits," or something similar, that describes the healthcare services covered by the plan. Although the specific language in the various plans differs, most plans state that they cover healthcare services if the services are authorized by a physician or other qualified provider and are "medically necessary" for the treatment of an illness or injury. The plans also specify which healthcare services the plans will *not* pay for, and state that coverage provided for "covered services" is subject to any exclusions listed in the plan, including an exclusion for "not medically necessary" or "not needed" services, as well as financial terms that include various payment caps and provisions for copayments for some or all services.

Applicable to this case, for example, all class member plans at issue expressly cover services to treat mental health conditions and substance use disorders, including residential treatment services, *provided* the services are authorized by a physician, deemed medically necessary, *and* not subject to plan exclusions or limitations, including exclusions for "maintenance therapy," "custodial care" and "not medically necessary services," limitation expressly included in several of the plans.

Each plan administered by UMR also contains a specific definition of a "medical necessity" that must be satisfied in connection with the coverage and exclusion requirements. Specifically, most of plaintiffs' and the sample plans define "medical necessity" or "medically necessary services" similarly, requiring that health care services be:

> (1) in accordance with generally accepted standards of medical practice; and

> (2) clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury, mental illness, substance abuse disorder, disease or its symptoms; and
>
> (3) not mainly for a member's convenience including services provided mainly for the convenience of the patient or the patient's health care provider; and
>
> (4) the most appropriate, most cost-efficient level of service, supply or drug that can be safely provided to the member and that is at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of the illness, disease or symptoms.

(Plts.' PFOF (dkt. #149) ¶¶ 52–55) (discussing and summarizing provisions from several plans that include substantially similar language and definitions of "medical necessity"); Dfts. PFOF (dkt. #140) ¶¶ 14–17) (providing different "medical necessity" definitions for several plans.

Many of the plans also include a standard definition of "generally accepted standards of medical care" as:

> standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, relying primarily on controlled clinical trials, or, if not available, observational studies from more than one institution that suggest a causal relationship between the service or treatment and health outcomes.
>
> If no credible scientific evidence is available, then standards that are based on Physician specialty society recommendations or professional standards of care may be considered.

(Plts.' PFOF (dkt. #149) ¶¶ 56, 57–58.)  The named plaintiffs' plans and all but four of the plans in the class "sample" also state that in determining what services are "medically necessary," UMR "applies clinical policies that describe the Generally Accepted Standards

of Medical Practice, scientific evidence, prevailing medical standards and clinical guidelines supporting our determinations regarding specific services."  (*Id.* ¶ 59.)

Finally, most of the plans give UMR the sole discretion to:  evaluate whether services, supplies or treatment are medically necessary and appropriate; and to help ensure cost-effective care.

## C.  Level-of-Care Guidelines

To standardize its medical necessity review under a member's plan, UMR adopted "level-of-care guidelines," which among other things, establish criteria to determine the appropriate level of care for behavioral health issues, including substance abuse and mental health conditions.   Available levels of care may include inpatient, hospitalization, residential treatment, intensive outpatient, or outpatient treatment options.

UMR began using the level-of-care guidelines at issue in this case in 2009.  These guidelines were developed originally by UMR's corporate affiliate, United Behavioral Health (UBH), with the involvement of several psychiatrists, and reissued annually.[3] Before deciding to adopt UBH's guidelines, a UMR committee, which included board-certified physicians who had been involved in drafting UMR's existing guidelines, reviewed UBH's guidelines, determined that they had been developed by specialists, were of high

---

[3] UMR apparently used five, different versions of the level of care guidelines in making "medical necessity" determinations during the class period, but the parties identify *no* differences between the versions that are material to the issues before this court.  UMR stopped using the UBH-created guidelines to make medical necessity determinations for substance abuse services and mental health services in April 2019 and January 2020, respectively.

quality and robust, were used throughout the UBH network, and had received positive feedback from providers. The guidelines were made available to plan members, treating providers, and other interested persons outside the company.

According to UMR, each edition of its level-of-care guidelines at issue are meant "to standardize coverage determinations, promote evidence-based practices, and support members' recovery, resiliency, and wellbeing." (Plts.' PFOF (dkt. #149) ¶ 184.) In evaluating coverage requests, the guidelines further instruct that UMR staff must review any applicable state or federal laws and the patient's plan documents that may supersede the guidelines. The 2016, 2017, and February 2018 guidelines claim to have been "derived from generally accepted standards of behavioral health practice," which "include guidelines and consensus statements produced by professional specialty societies, as well as guidance from governmental sources." (*Id.* ¶¶ 189, 190.) Each edition of the guidelines also includes a reference section, which cites publications of professional societies, government health agencies and professional standards, including from the American Society of Addiction Medicine (ASAM), American Academy of Clinical Psychiatrists' Level of Care Utilization System (LOCUS), and American Academy of Child and Adolescent Psychiatry's Child and Adolescent Level of Care Utilization System (CALOCUS).

UMR's level-of-care guidelines further include criteria that medical necessity reviewers are to consider in evaluating coverage requests for behavioral health treatment at any level of care, as well as criteria that applies specifically to requests for admissions, for continued service, and for discharge. For example, the 2016 guidelines state that when evaluating a request for any level of care, reviewers must consider, among other things,

whether:  (1) the member is eligible for benefits; (2) the member's condition and proposed services are covered by the benefit plan; (3) the services are within the scope of the provider's professional training and licensure; (4) the member's current condition cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive level of care; (5) the member's current condition can be safely, efficiently, and effectively assessed and/or treated in the proposed level of care; (6) the member's condition requires the intensity of services provided in the proposed level of care, considering acute changes in the member's signs and symptoms and/or psychosocial and environmental factors (i.e., the "why now" factors leading to admission); (7) co-occurring behavioral health and medical conditions can be safely managed; (8) services are consistent with generally accepted standards of clinical practice, backed by credible research, not considered experimental, consistent with [UBH's] best practice guidelines and clinically appropriate for the member's behavioral health conditions based on generally accepted standards of clinical practice and benchmarks; (9) there is a reasonable expectation that services will improve the member's presenting problems within a reasonable period of time; and (10) the treatment is not primarily for the purpose of providing social, custodial, recreational or respite care.  (Dkt. #128-82, at 8–9; *see also* 2017 guidelines (dkt. #128-84) at 3; 2018 guidelines (dkt. #128-86) at 3; 2019 guidelines (dkt. #128-87) at 2) (providing nearly identical criteria).)

In addition, the 2016, 2017, and February 2018 guidelines include sections setting forth additional criteria for admission, continued service and discharge for residential rehabilitation services for substance abuse disorders.  Similarly, all the guidelines at issue include sections addressing criteria for evaluating residential treatment for mental health

conditions.   For example, when evaluating residential treatment requests under 2016 guidelines, reviewers were instructed to consider: (1) all the common criteria, discussed above; (2) whether the member is not in imminent or current risk of harm to self, others, and/or property; and (3) whether the "why now" factors leading to admission cannot be safely, efficiently or effectively assessed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors.  (*Id.* at 37; *see also* 2017 guidelines (dkt. #128-84) at 10;) 2018 guidelines (dkt. #128-86) at 14–15; 2019 guidelines (dkt. #128-87) at 15) (providing substantially identical criteria).)

Finally, the level of care guidelines were not intended to be "comprehensive"; instead, the guidelines required reviewers to use their clinical discretion in applying them to account for: age and developmental stage, underlying chronic conditions, acute conditions, chief complaints, the presence or absence and ability to manage co-occurring disorders, and the safety and efficacy of a proposed treatment.  Thus, the 2016 guidelines explain that:

> The Level of Care Guidelines is [to be] used flexibly, and is intended to augment—but not replace—sound clinical judgment. Use is informed by the unique aspects of the case, the member's plan, services the provider can offer to meet the member's immediate needs and preferences, alternatives that exist in the service system to meet those needs, and the member's broader recovery, resiliency and wellbeing goals.

(*Id.* at 6.)   Accordingly, all editions of the guidelines state that residential treatment coverage requests are properly denied when a member's condition can be safely, efficiently, and effectively assessed and treated in a less intensive level of care.

### D. UMR's Coverage Review Process

UMR uses a uniform process to make coverage decisions.  First, a UMR clinical reviewer, who is a licensed nurse, reviews the coverage request by collecting information from UMR's electronic case records and the patient's provider.  The clinical reviewer considers clinical and provider information, the plan language and level-of-care guidelines, and then applies clinical judgment and medical expertise to determine whether the services meet the required criteria for the requested level of care.  If the reviewer determines that the requested services satisfy the level-of-care guidelines, the reviewer can approve coverage.  All of the nurses who review prior authorizations for mental health and substance abuse healthcare services are specialists in behavioral health and have received extensive training from UMR.

Even then, however, nurses are not authorized to issue adverse benefit determinations; instead, they must forward any cases that do not result in a straightforward approval.  From there, independently-contracted, medical doctors must engage in a further review and provide a written explanation for any denials of coverage, specifying which guidelines were applied *and* which clinical criteria were not met.  Each of these reviewing doctors are specialists in the type of claim they are reviewing, and must not only consider the forwarded materials but apply their clinical judgment, medical expertise, published medical literature and other information about the patient's condition and treatment deemed relevant before determining whether the requested services satisfy criteria under the level-of-care guidelines.

During the 3½ year class period (roughly July 2016 to January 2020), UMR approved the majority of requests for residential treatment services for mental health and substance use disorders -- approving 62.7% of requests in full and 17.8% more in part. UMR also approved a broad range of residential treatment periods, from 7 days in some cases to over 100 days in others, depending on patient-specific criteria, including medical necessity, duration options and cost.  Moreover, for those that had coverage denied, UMR sends a letter explaining the reasons for the denial.  UMR's administrative staff also copy the rationale into UMR's internal claims data system, and then send the member a written notification letter informing him or her of UMR's determination and rights of appeal.

If the member appeals that denial, UMR next forwards the appeal to a physician-reviewer who was not involved in the initial determination.  These physicians are also specialists in the type of claim they are reviewing and are generally Board-certified.  The physicians review the previously collected clinical information and, again, decide whether the services satisfy the criteria under the applicable level-of-care guideline(s).

### E.  Plaintiffs' and Class Members' Requests for Residential Treatment

The named plaintiffs and the other class members each submitted coverage requests to UMR seeking coverage of residential treatment for a patient's mental health condition or substance abuse disorder during the 3½ year class period.  Moreover, all of the randomly chosen class members had been diagnosed with one or more mental health conditions or substance abuse disorders that met the plans' definitions of "illness," and all but one of those class members had been prescribed residential treatment by a licensed, qualified healthcare provider.  Nevertheless, UMR denied coverage to each class member after

10

determining under the level-of-care guidelines that the services did *not* satisfy the plan's medical necessity requirement.  Thus, each of the denial letters to the class members stated:

> We review health care services required for coverage under the terms of your health benefit plan to determine if they are medically necessary, as defined in your plan document.  We received a request to review an admission for you.  Based on the information submitted, we have determined that the requested service(s) is/are not medically necessary.

(Plts.' PFOF (dkt. #149) ¶ 157.)  The letters next provided the details and clinical reasons for the denial, setting forth aspects of the patient's clinical presentation that the reviewer found to be pertinent to the medical necessity determination, identifying the level-of-care guidelines considered, and reiterating that UMR determined that residential treatment was "not medically necessary."  (*Id.* ¶ 159.)  In each such letter, UMR did not dispute any patient's diagnosis or state that the patient did not need treatment, but instead, all of the letters stated that the patient could be treated in a lower level of care.[4]  Each of the plans provides a process for appealing any denial of coverage.

The named plaintiffs' plans, as well as each plan identified as part of the parties' 50 randomly selected claims, state that plan members must exhaust the review process before seeking judicial relief.  Both named plaintiffs filed administrative appeals of UMR's denial, which were denied.  However, *none* of the plaintiffs or other class members challenged the use of the level-of-care guidelines on appeal.

---

[4] More specifically, the letters directed 8 patients to outpatient treatment, 24 patients to intensive outpatient treatment, and 16 class members to partial hospitalization.

OPINION

Plaintiffs claim that UMR violated ERISA by: (1) breaching its fiduciary duty as claims administrator by adopting and applying level-of-care guidelines inconsistent with plaintiffs' plans; and (2) arbitrarily and capriciously denying their claims for residential treatment benefits. UMR challenges plaintiffs' claims on several grounds, including lack of standing and a lack of evidence sufficient for a reasonable trier of fact to find for plaintiffs on the merits.[5] Because standing is a requirement for the court's subject matter jurisdiction under Article III of the Constitution, the court addresses UMR's standing arguments first. *See Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020).

## I. Article III Standing

To establish constitutional standing on behalf of themselves and the class members, plaintiffs must show: (1) they suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) the injury was caused by the defendant; and (3) the injury would likely be redressed by the requested judicial relief. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021). As the United States Supreme Court has repeatedly held, a plaintiff does not automatically satisfy these injury requirements simply because a statute grants rights to a person and purports to authorize that person to sue to vindicate those rights. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). Instead, "Article III standing

---

[5] UMR also argues that several individual class member's claims are barred because: they are untimely; the members failed to exhaust their respective plans' administrative remedies; the members assigned their right to benefits to another entity; or because the member's coverage request was denied for reasons independent of the level of care guidelines. As discussed below, the court ultimately concludes that plaintiffs' claims fail for lack of standing and on the merits. Thus, the court declines to address UMR's alternative arguments.

requires a concrete injury even in the context of a statutory violation." *Id.* Moreover, the Supreme Court has recently emphasized that there "is no ERISA exception to Article III." *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1622 (2020).

Here, plaintiffs allege that they were injured by UMR's adoption of level-of-care guidelines and its application of these guidelines to deny their requests for residential treatment despite the guidelines being inconsistent with their health benefit plan terms and UMR's fiduciary duties under ERISA. Contrary to UMR's arguments, therefore, plaintiffs' alleged injuries are actual, concrete, sufficiently particularized, and traceable to UMR's conduct. In particular, UMR's alleged violations are *not* the sort of "bare procedural violation[s] divorced from any concrete harm" that are insufficient to establish Article III standing. *Spokeo*, 578 U.S. at 341. Rather, the level-of-care guidelines at the heart of plaintiffs' claims were allegedly used to deny plaintiffs' requests for coverage of residential treatment in breach of fiduciary duties to plan members under ERISA. Plaintiffs' alleged injuries are also sufficiently particularized, as plaintiffs have submitted sufficient evidence to show that UMR denied their coverage requests, at least in part, because their requests did not satisfy the criteria for coverage of residential treatment set forth in its guidelines.

Nevertheless, UMR argues that plaintiffs cannot establish an actual injury or traceability without proving that their coverage requests would have been granted *but for* UMR's application of the challenged guidelines. Further, UMR points to evidence in some class members' records suggesting that their requests for coverage of residential treatment were denied on grounds other than alleged flaws in the guidelines, and that some of the requests would have been denied even under the level-of-care criteria now urged by

plaintiffs and their experts.  However, UMR cites no legal authority stating that to meet the injury-in-fact requirement for constitutional standing, an ERISA plaintiff must prove that he or she certainly would have been awarded benefits.  To the contrary, in reviewing a plaintiff's standing to pursue a claim for an alleged arbitrary and capricious denial of benefits, courts generally do *not* determine whether the claimant should have been awarded benefits; rather, the court's standing analysis turns on whether the decision-maker abused its discretion by, for example, applying an unreasonable interpretation of plan terms or disregarding significant facts in the record.  *See Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 321–22 (7th Cir. 2007).

Even if a court ultimately determines that an ERISA plan administrator's benefits decision *was* arbitrary and capricious, the remedy does not usually result in an award of benefits, but instead in a remand for a fresh administrative review and decision.  *See Lacko v. United of Omaha Life Ins. Co.*, 926 F.3d 432, 447 (7th Cir. 2019) ("The most common remedy when an ERISA plan administrator's benefits decision is deemed arbitrary is to remand the matter for a fresh administrative decision.").  Here, plaintiffs allege that UMR made arbitrary and capricious benefits decisions by applying unfair and unreasonable level-of-care guidelines.  Thus, these allegations, along with plaintiffs' supporting evidence showing that UMR reviewers considered and relied upon the guidelines to support their decisions to deny coverage, are sufficient to establish that plaintiffs and the other class members suffered an actual injury that is traceable to UMR's conduct.

A more difficult question is whether plaintiffs have satisfied the third element of standing: redressability.  To satisfy this element, plaintiffs must show that a favorable

14

judicial decision would redress their injuries by providing them with "effectual relief." *Taylor v. McCament*, 875 F.3d 849, 853 (7th Cir. 2017). If granted, therefore, the relief sought must "make a difference to the legal interests of the parties (as distinct from their psyches, which might remain deeply engaged with the merits of the litigation)." *Killian v. Concert Health Plan*, 742 F.3d 651, 661 (7th Cir. 2013) (citations omitted). In this case, plaintiffs have requested one form of relief: reprocessing of their benefits claims using medical necessity guidelines that are consistent with their plan terms. As a result, to satisfy the redressability element of constitutional standing, plaintiffs must show that reprocessing their claims would provide them a form of effectual relief.

Certainly, in some cases, reprocessing a coverage request could indeed provide effective relief to an ERISA plaintiff. For example, as the Supreme Court explained in *Aetna Health Inc. v. Davila*, 542 U.S. 200 (2004), a beneficiary who is denied benefits can pay for the treatment themselves, then seek reimbursement through an ERISA § 502(a)(1)(B) action. *Id.* at 211–12. Alternatively, the beneficiary could seek a preliminary injunction requiring a reprocessing of their claim. *Id.* In such circumstances, the claimant's injury (denial of treatment and/or monetary loss) could also be redressed by reprocessing their coverage claim. Likewise, an ERISA plaintiff who is still seeking the denied treatment, or who is seeking long-term disability benefits or other monetary relief, could receive effective relief via a remand for reprocessing.

For example, in *Lacko*, the ERISA plaintiff sought short and long-term disability benefits, prompting the Seventh Circuit to find standing and order a remand of plaintiff's claim for reprocessing despite knowing that on remand she may still be denied *effective*

relief. 926 F.3d at 447. Similarly, in the cases cited by plaintiffs, reprocessing was deemed effective redress for the plaintiffs' injuries because benefits could still be awarded. *See Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 477 (7th Cir. 1998) (plaintiff seeking long-term disability benefits); *Gallo v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir. 1996) (challenging calculation of pensions); *Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 460–61 (9th Cir. 1996) (long-term disability benefits); *Miller v. United Welfare Fund*, 72 F.3d 1066, 1073–74 (2d Cir. 1995) (claim for reimbursement of medical costs paid by plaintiff). Finally, an ERISA plaintiff who is challenging current plan interpretations could obtain relief through reprocessing. *See Wit v. United Behav. Health*, No. 20-17363, 2022 WL 850647, at *1 (9th Cir. Mar. 22, 2022) (plaintiffs had standing to challenge guidelines that were currently used to determine scope of the coverage provided by their plans).

However, none of these circumstances necessarily apply to the plaintiffs here. First, UMR's denials of coverage for residential treatment services occurred between three and six years ago. Since then, UMR has stopped using the disputed guidelines, and plaintiffs have neither argued nor shown that the current guidelines are invalid, nor that UMR is likely to revert to the previous UBH guidelines. Plaintiffs also have neither alleged nor offered proof that any members' health conditions are the same as they were at the time of the denials, much less that any members are still seeking residential treatment for the same conditions that existed when their previous requests were denied. Nor have plaintiffs offered evidence showing any member actually paid out-of-pocket for residential treatment

16

after UMR denied its coverage claim, entitling them to reimbursement should plaintiffs prevail.

Moreover, UMR *has* identified class members who:  did not pursue residential treatment after UMR's denial; received residential treatment paid for by other insurance; and received and paid for residential treatment at a lower rate than they would have paid had UMR approved their coverage requests.  (Dfts.' PFOF (dkt. #140) ¶¶ 160–169.)  Thus, plaintiffs' claims are more similar to cases in which courts have concluded that some plaintiffs could not obtain relief under ERISA due to the individual circumstances.  *E.g.*, *Durham v. Health Net*, 108 F.3d 337, 337 (9th Cir. 1997) (ERISA plaintiff could not obtain relief because she did not obtain the denied treatment, did not accrue recoverable costs, and was no longer a candidate for the treatment); *Hamann v. Indep. Blue Cross*, 543 F. App'x 355, 357 (5th Cir. 2013) (ERISA does not "provide that beneficiaries can recover benefits they did not, and now cannot, receive.").

While plaintiffs respond that reprocessing would still vindicate their right to have UMR make benefits decisions using guidelines that comport with their health benefit plans, plaintiffs' request for an order requiring UMR to comply with its ERISA duties in a reasonable and non-arbitrary manner is not sufficient to establish standing *if* reprocessing would not affect plaintiffs' rights or even have any practical impact on the parties.  *See Thole*, 140 S. Ct. at 1618 ("claim[ing] that the defendants violated ERISA's duties" is not enough if "[w]inning or losing this suit would not change" plaintiffs' benefit); *see also North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (a court lacks subject matter jurisdiction if its decision can no longer affect the rights of litigants in the case before it and would be

nothing but an advisory opinion on hypothetical facts); *Stotts v. Community Unit Sch. Dist. No. 1*, 230 F.3d 989, 990 (7th Cir. 2000) (when a court's decision would have no practical impact on the parties, the case is moot).

Here, plaintiffs have identified no evidence showing that reprocessing would have a practical impact on the legal rights of *any* class member.  More likely, the named plaintiffs and class members could not now receive the residential treatment they were denied, as their medical circumstances would have certainly changed since UMR's denials.  Nor could plaintiffs or class members recover monetarily if they did not receive and pay for treatment themselves.  Thus, on the current record, plaintiffs' claims are analogous to cases in which students and their parents have challenged a school district's compliance with the Individuals with Disabilities Education Act (IDEA).  In those cases, the Seventh Circuit has explained that a plaintiffs' request for injunctive relief in such cases becomes moot if the court's decision would not provide any actual or effective relief to the student.

For example, in *Brown v. Bartholomew Consol. Sch. Corp.*, 442 F.3d 588 (7th Cir. 2006), the parents of an autistic child filed a lawsuit for injunctive and declaratory relief, challenging the individualized education plan provided for their child.  *Id.* at 590.  While the case was pending, the child moved to a different school district and his parents agreed to a new individualized education plan.  *Id.*  Under the circumstances, the Seventh Circuit held that the plaintiffs' claims for injunctive relief were moot because even if the court decided "who was correct about [the child's] outdated IEP," "[i]t would do nothing to define the contours of the parties' continuing legal relationship under the IDEA, such that future repetitions of the injury could be avoided."  *Id.* at 599–600.  The court went on to

explain that because the child's needs would continue to change, any judgment made regarding previous decisions by the school district would neither affect those previous decisions nor provide effective relief to the parties going forward. *Id.*; *see also Ostby v. Manhattan Sch. Dist. No. 114*, 851 F.3d 677, 682 (7th Cir. 2017) (dismissing IDEA case as moot where student was "no longer subject to the challenged IEP," and declaring the previous IEP as inappropriate would not provide meaningful relief); *Downers Grove Grade School Number 58 Board v. Steven L.*, 89 F.3d 464, 467 (7th Cir. 1996) (holding in another IDEA case, that having "already agreed to a new IEP with a different school district," the parents "are without an actual injury traceable to the defendant that could be redressed by a favorable judicial decision").[6]

Similar to the plaintiffs in these IDEA cases, plaintiffs here have requested injunctive and declaratory relief under ERISA that would arguably provide no effective relief.[7]  For example, even if the court concluded that UMR abused its discretion and improperly denied them benefits in violation of ERISA, plaintiffs have not shown that a reprocessing order would redress their injuries.  The court is left to conclude that an order requiring UMR to reprocess plaintiffs' and all class members' rejected claims would result

---

[6] *Cf.*, *Ankh El v. Sevier*, No. 120CV00009SEBDLP, 2020 WL 8674032, at *2 (S.D. Ind. July 6, 2020) (dismissing case in which petitioner was challenging revocation of his parole because he had been released from custody already, and "there [wa]s no redress the Court could offer[,] even if the Court reached the merits of his arguments and concluded the revocation of his probation was unconstitutional").

[7] The available remedies under ERISA are specifically established by Congress and preclude an award of other potential remedies.  Thus, plaintiffs could not recover, for example, damages that they allegedly incurred because of a delay in receiving the requested residential treatment.  *See Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 145 (1985) (ERISA does not provide a damages remedy when undue delay causes harm to a beneficiary).

in UMR engaging in a major undertaking with no potential for an actual, concrete benefit to plaintiffs or the class members.  Moreover, without evidence of redressability, this court lacks subject matter jurisdiction over plaintiffs' claims.

All that being said, the court's own review of the record in this case shows that the named plaintiffs, Berceanu and Hernandez, could establish standing.  Specifically, a review of their depositions shows that despite UMR's denial of coverage for their residential treatment requests, the named plaintiffs received and paid for residential treatment on behalf of family members.  (Berceanu Dep. (dkt. #58-10) 77-78); Hernandez Dep. (dkt. #58-3) 45-49).  Thus, if they were to prevail on the merits, an order requiring UMR to reprocess their claims could, at least potentially, require a reimbursement of out-of-pocket costs they paid for the residential treatment.

It seems probable, or at least possible, that *some* of the class members would also be able to establish redressability and standing to assert similar reprocessing claims, either because they paid out of pocket for residential treatment services or because they have an ongoing, chronic condition for which they still seek residential treatment.  However, the court sees little purpose in giving plaintiffs another opportunity to submit additional evidence on behalf of class members, since the record at summary judgment demonstrates that this action is no longer fit for adjudication on a class-wide basis, at least as currently drafted.  *See Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 777 (7th Cir. 2013) (district court may decertify class as appropriate in response to the progression of the case); *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890, 896 (7th Cir. 1981) ("If the certification of the class is later deemed to be improvident, the court may decertify.")

20

Specifically, the evidence of record shows already that whether plaintiffs and class members could obtain effective relief from reprocessing, and thereby establish standing, will require an individual, fact intensive inquiry and vary substantially among class members.  (Dfts.' PFOF (dkt. #140) ¶¶ 160–169.)  Thus, the court concludes that the individualized circumstances of the class members on the issue of standing defeat the elements of commonality and typicality necessary to sustain this case as a class action. Moreover, plaintiffs have not shown as class members that they are similarly situated to other members of the class, nor that an injunction or declaratory relief would provide relief to each member of the class.  *See Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 443 (7th Cir. 2015) ("A Rule 23(b)(2) class is appropriate if "a single injunction or declaratory judgment would provide relief to each member of the class."). Accordingly, the court will decertify the class and will only address the merits of the named plaintiffs' ERISA claims.

## II.    Merits of Named Plaintiffs' ERISA Claims

Plaintiffs' breach of fiduciary duty and denial of benefits claims are based on the same set of facts.  Plaintiffs contend that UMR breached its fiduciary duties and improperly denied plaintiffs' requests for benefits by relying on its own level-of-care guidelines to interpret and apply the medical necessity requirement of their health benefit plans when making coverage decisions.[8]

---

[8] UMR has not disputed that it was a plan fiduciary under ERISA by virtue of its designation as administrator of mental health and substance abuse benefits under plaintiffs' and class members' health benefit plans.

The first question is what standard of review applies to plaintiffs' ERISA claims. Generally, ERISA plans give an administrator discretion to determine eligibility for benefits, which the court reviews under the arbitrary and capricious standard. *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 860–61 (7th Cir. 2009) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).)[9] This standard of review is highly deferential, with the court looking only to ensure that the administrator's decision has "rational support in the record." *Id.; see also Jackman Fin. Corp. v. Humana Ins. Co.*, 641 F.3d 860, 864 (7th Cir. 2011) ("Under the arbitrary and capricious standard, we overturn the administrator's decision only where there is an absence of reasoning to support it."); *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 606 (7th Cir. 2007) (court must uphold plan administrator's decision so long as administrator "makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts"). In conducting an arbitrary and capricious review, courts are generally limited to reviewing the administrative record. *Perlman v. Swiss Bank Corp.*, 195 F.3d 975, 981 (7th Cir. 1999) ("Deferential review of an administrative decision means review on the administrative record."); *Dragus v. Reliance Standard Life Ins. Co.*, 882 F.3d 667, 674 (7th Cir. 2018) (district court properly declined to consider evidence outside the administrative record when conducting arbitrary and capricious review).

Plaintiffs concede that their fiduciary duty and denial of benefits claims are subject to arbitrary and capricious review. (Plts.' Br. (dkt. #144) at 41.) However, they argue

---

[9] This standard is also used interchangeably by the parties and the court as an "abuse of discretion" standard. *See Raybourne v. Cigna Life Ins. Co. of New York*, 576 F.3d 444, 449 (7th Cir. 2009) (the "arbitrary-and-capricious standard . . . is synonymous with abuse of discretion" in ERISA cases).

that in conducting this review, the court should consider their experts' reports and other evidence outside the administrative record.   However, plaintiffs cite no controlling authority to support this.   Rather, the cases they cite in which courts looked outside the administrative record all involved an application of *de novo* review, because the claims administrator had a conflict of interest (typically, a financial stake in the funds used to pay valid claims) or other "exceptional circumstances" existed to warrant a discrete inquiry outside the administrative record.   *E.g., Patton v. MFS/Sun Life Fin. Distributors, Inc.*, 480 F.3d 478, 491 (7th Cir. 2007) (court applying *de novo* review); *Steinman v. Hicks*, 252 F. Supp. 2d 746, 760 (C.D. Ill.), aff'd, 352 F.3d 1101 (7th Cir. 2003) (challenge to a fiduciary's investment decision).   By way of contrast, Seventh Circuit cases addressing denial of benefits claims or challenges to an administrator's plan interpretation under an arbitrary or capricious standard have generally been limited to a review of the administrative record.   *E.g., Gallo*, 102 F.3d at 922–23; *Lacko*, 926 F.3d at 437.

Applying an abuse of discretion standard, and reviewing only the administrative record, the court concludes that no reasonable trier of fact could find that UMR violated its fiduciary duties under ERISA, or find it wrongfully denied plaintiffs' benefit requests by adopting the UBH-developed, level-of-care guidelines, where the only question is whether there is "sufficient rational support" in the record for UMR's decisions.   *See Black v. Long Term Disability Ins.*, 582 F.3d 738, 745 (7th Cir. 2009).

Here, the record shows that plaintiffs' health benefits plans gave UMR discretion to interpret plan terms in determining whether a requested service was covered.   Moreover, UMR exercised that discretion by adopting a multi-level review and appeals process,

including consideration of coverage requests by medical professionals with specialized training and clinical expertise in psychiatry and behavioral health.  While those reviewers were tasked with consulting UMR's level-of-care guidelines -- themselves developed by other professional psychiatrists and using published professional standards as a guide, along with the publications of professional societies and government health agencies -- the guidelines were not intended to provide a *comprehensive* guide on behavioral health treatment, but rather were intended to provide a framework by which reviewers were to apply their clinical expertise to patient-specific conditions.  The administrative records of each named plaintiff, as well as the records from 50 patient files chosen at random from the class, further show that medical necessity reviewers actually applied the level-of-care guidelines to the specific facts of each plaintiffs' and class members' medical situation when evaluating their coverage requests.   In response, plaintiffs identify nothing in the administrative record suggesting that UMR's actions were arbitrary and capricious.

Instead, plaintiffs' arguments rely almost entirely on the opinions of two experts -- Drs. Andrew Gerber and Marc Fishman -- who opined that UMR's level-of-care guidelines were more restrictive than generally accepted standards of care for mental illness and substance abuse disorders.  However, plaintiffs' arguments are flawed for several reasons. *First*, plaintiffs incorrectly conflate the "medically necessary" standard in their health benefit plans with "generally accepted standards of care," arguing that UMR's medical necessity criteria must "track" generally accepted standards of care, and because UMR instead used the level-of-care guidelines to determine medical necessity, the guidelines must also "track" generally accepted standards as well.  (Plts.' Br. (dkt. #144) at 37–38.)

24

However, this argument ignores the additional components of the medical necessity review set forth in the plans themselves, as well as the role medical experts played in developing the guidelines *and* in reviewing an individual's request for coverage.

As discussed above, the plans define "medically necessary services" to include multiple components *in addition* to whether the services being provided are "in accordance with generally accepted standards of medical practice," including that the services are: "considered effective for the patient's illness, injury, mental illness, substance abuse disorder, disease or its symptoms"; and "the most appropriate, most cost-efficient level of service . . . that can be safely provided to the member and that is at least as likely to produce equivalent therapeutic or diagnostic results." (Plts.' PFOF (dkt. #149) ¶¶ 52–55.)

In criticizing the level-of-care guidelines as adopted and applied, therefore, plaintiffs fail to consider whether the aspects of the guidelines they purport to challenge are rationally relevant to these additional medical necessity criteria. For example, plaintiffs complain that the guidelines improperly favor "less intensive treatment." However, most of the *plans* themselves favor less intensive treatment by expressly limiting coverage to treatment that is the least costly alternative likely to produce at least equivalent results. (*See, e.g.* Plts.' PFOF (dkt. #149) ¶¶ 52–55.).)

*Second*, plaintiffs fail to acknowledge that the *plans* afforded UMR discretion as the administrator to interpret ambiguities in plan language. Although plaintiffs argue that their experts' opinions provide the correct meaning of "generally accepted standards of care," they also concede that (1) the plans' definitions of "generally accepted standards" is "ambiguous," (2) the plans did not require UMR to use specific "generally accepted

standards," and (3) "more than one set of standards might meet the definition." (Plts.' Br. (dkt. #144) at 44.)  Further, plaintiffs submit no *evidence* that their preferred standards were the *only* reasonable standards during the relevant period, or even that most behavioral health practitioners used the standards urged by plaintiffs' experts, much less that UMR acted "arbitrarily" or "capriciously" in largely adopting UBH's guidelines.  Instead, the gist of plaintiffs' arguments is that their proposed standards would have resulted in better care for patients.

However, this court is simply not empowered to disregard UMR's interpretation of medical necessity, which was undisputedly developed by psychiatry experts, in favor of something "better."  "When a plan is open to more than one interpretation, [the court] will not find the administrator's decision arbitrary and capricious just because [it] would have reached a different conclusion or relied upon different authority had [it] been in the administrator's shoes."  *Rabinak v. United Bhd. of Carpenters Pension Fund*, 832 F.3d 750, 754 (7th Cir. 2016) (citation omitted).  Rather, UMR is entitled to deference under an abuse-of-discretion standard in interpreting ambiguities in the plan language.  *Firestone Tire & Rubber Co.*, 489 U.S. at 111.  Moreover, contrary to plaintiffs' position, "[t]he confines of the ERISA statute . . . do not permit . . . district courts, to engage in the complex weighing of expert testimony when a plan administrator has been granted discretionary authority."  *Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 813 (7th Cir. 2006).

*Third*, even if the court were to look outside the administrative record to consider the opinions of Drs. Gerber and Fishman, the court finds no genuine dispute of material fact regarding whether UMR abused its discretion in adopting and applying its level-of-

care guidelines.  While Drs. Gerber and Fishman purport to opine on "generally accepted standards" of care for mental illness and substance abuse from 2016 to 2020, they actually criticize the guidelines on several grounds.  In particular, they opine that the guidelines: (1) have an exaggerated focus on acute symptoms; (2) fail to emphasize the importance of treating chronic and co-occurring disorders; (3) favor less intensive treatment; (4) require members to fail at less intensive levels of care before receiving residential treatment; (5) require a reasonable expectation of improvement without acknowledging the need for maintenance and prevention; (6) expect improvement within a particular period of time; (7) fail to consider the unique needs of children and adolescents; and (8) fail to require a "multidimensional assessment."  (Plts.' Br. (dkt. #144) at 20–21; Fishman Rep. (dkt. #115); Gerber Rep. (dkt. #117).)  For the most part, however, these critiques of the guidelines are either contrary to the guidelines themselves, or they amount to disagreements over wording or level of detail insufficient to create an actual, factual conflict between the guidelines and generally accepted standards, particularly in the abstract.

For example, plaintiffs' experts criticize the level-of-care guidelines for failing to "stress" the importance of:  chronic and co-occurring conditions, the safety and effectiveness of treatment, and evaluating whether effective care required an intensive and restrictive setting.  (Fishman Dep. (dkt. # 119) at 110–12.)  However, the guidelines expressly provide for consideration of those very factors.  (2016 guidelines (dkt. #128-82) at 8 (whether "member's current condition can be safely, efficiently, and effectively assessed and/or treated in the proposed level of care"), at 9 (whether "co-occurring behavioral health and medical conditions can be safely managed).  Similarly contrary to

plaintiffs' arguments, UMR's guidelines do *not* place any specific limit on the duration of treatment, nor require an individual to fail treatment at a less intensive level of care before residential care will be approved. (*Id.* at 8) ("Failure of treatment in a less intensive level of care is <u>not</u> a prerequisite for authorizing coverage") (emphasis in original). Instead, the guidelines recognize that the appropriate type and duration of treatment for behavioral health disorders must be based on the individual needs of the patient. (*Id.* at 9) ("Improvement . . . is measured by weighing the effectiveness of treatment against evidence that the member's signs and symptoms will deteriorate if treatment in the current level of care ends. Improvement must also be understood within the broader framework of the member's recovery, resiliency and wellbeing.").

Plaintiffs also criticize UMR's level-of-care guidelines for failing to include a detailed discussion about the unique needs of children and adolescents. However, plaintiffs fail to acknowledge that the administrative records for class members show that cases involving adolescents were assigned to doctors with board certification subspecialties in child and adolescent psychiatry, who in turn were to apply their clinical judgment taking the patient's age into account. (Dft.'s PFOF (dkt. #140) ¶¶ 127–28 (providing examples of adolescent claims samples).)

In fact, *all* of plaintiffs' arguments seem to ignore that UMR's level-of-care guidelines are ultimately applied by experts with extensive experience in behavioral health -- usually board-certified psychiatrists -- who obviously knew how to make level-of-care determinations *and* what patient-specific factors should be considered. Indeed, even a cursory review of the administrative records of plaintiffs and the sample class members

shows that UMR psychiatric reviewers considered a variety of patient-specific factors not expressly included in the guidelines, but still considered relevant in the reviewer's clinical judgment.  (*Id.* ¶¶ 134–35 (providing examples of claims samples in which reviewers discussed more specific factors, such as familial relations, past drug use, truancy from school, history of self-harm, pending criminal charges, sober support, motivation for treatment and life stressors).)

Ultimately, none of plaintiffs' critiques or evidence begin to support a finding that UMR abused its discretion, much less acted arbitrarily or capriciously.  At most, plaintiffs have shown that medical experts can disagree about significant factors that should be considered in evaluating the appropriate level of care for a patient suffering from mental illness and substance abuse.  However, "[r]aising debatable points does not entitle [the claimant] to a reversal under the arbitrary-and- capricious standard."  *Smith v. Office of Civilian Health* & *Med. Program of Uniformed Servs.*, 97 F.3d 950, 959 (7th Cir. 1996) (where there is valid "disagreement among qualified medical experts over a medical issue" the payor should be upheld, because courts are "virtually preclude[d]" from finding "one side is arbitrary or plainly wrong, even if the court finds other views more persuasive"); *Meiringer v. Metro. Life Ins. Co.*, 2009 WL 1788588, at *3 (D. Or. June 19, 2009) ("merely establish[ing] that room for disagreement existed in the medical community" is "insufficient to compel a conclusion that [administrator] abused its discretion").  As a result, plaintiffs' showing that UMR did not adopt the *specific* standards of care urged by plaintiffs and their experts is not sufficient reason to overturn UMR's decisions under

ERISA's abuse of discretion standard, and UMR is entitled to summary judgment on plaintiffs' ERISA claims.

### ORDER

IT IS ORDERED that:

1) This case is DECERTIFIED as a class action.  The claims of all non-named plaintiffs are DISMISSED WITHOUT PREJUDICE, leaving before the court the named plaintiffs who originated this action.

2) Defendant UMR, Inc.'s motion for summary judgment (dkt. #127) is GRANTED with respect to plaintiffs Luciana Berceanu and Judy Hernandez.

3) The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 10 day of February, 2023.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge